167 Wis.2d 53 (1992)
482 N.W.2d 60
IN the MATTER OF GUARDIANSHIP OF L.W., Incompetent: Paul J. LENZ, as Guardian ad Litem, Appellant-Cross Respondent,
v.
L.E. PHILLIPS CAREER DEVELOPMENT CENTER, Guardian, Respondent-Cross Appellant,
EAU CLAIRE COUNTY, Respondent,
and ST. FRANCIS HOSPITAL, Respondent-Cross Appellant.
No. 89-1197.
Supreme Court of Wisconsin.
Oral argument September 4, 1991.
Decided April 1, 1992.
*62 For the appellant-cross respondent there were briefs by Paul J. Lenz, Altoona, and James Bopp, Jr., Thomas J. Marzen, Mary N. Nimz, Daniel Avil and Deborah Gardner and The Center for the Medically Dependent and Disabled, Inc., co-counsel, Indianapolis, Indiana, and oral argument by Mr. Lenz.
For the respondent-cross appellant, L.E. Phillips Career Development Center, there was a brief by William G. Thiel, Eau Claire and oral argument by Mr. Thiel.
For the respondent-cross appellant, St. Francis Medical Center, there was a brief by Daniel T. Flaherty, Ellen M. Frantz and Johns & Flaherty, S.C., LaCrosse and oral argument by Ms. Frantz.
For the respondent, Eau Claire County, there was a brief by Robyn S. Shapiro and Quarles & Brady, Milwaukee and Keith R. Zehms, Eau Claire County Corporation Counsel, Eau Claire and oral argument by Ms. Shapiro and Mr. Zehms.
Amicus curiae brief was filed by Craig L. Parshall and Richard D. Martin, Menomonee Falls for The Rutherford Institute of Wisconsin.
Amicus curiae brief was filed by Helen Marks Dicks, Madison for the Center for Public Representation.
Amicus curiae brief was filed by Jay Gold, M.D. and Medical College of Wisconsin, Madison and Gretchen E. Miller and ACLU of Wisconsin Foundation, Milwaukee for the American Civil Liberties Union of Wisconsin Foundation and Wisconsin Bioethicists and other Health Professionals.
*63 HEFFERNAN, CHIEF JUSTICE.
This is an appeal taken on bypass pursuant to sec. 808.05, Stats., from a June 21, 1989 order of the circuit court for Eau Claire County, Gregory A. Peterson, Circuit Judge, granting L.E. Phillips Career Development Center, as guardian of L.W., the authority to consent to the withdrawal from L.W. of all life-sustaining medical treatment, including artificial nutrition and hydration. We affirm.
The issues in this case are whether an incompetent individual in a persistent vegetative state has a right to refuse life-sustaining medical treatment, including artificial nutrition and hydration, and whether a courtappointed guardian may exercise that right on the ward's behalf. We conclude that an incompetent individual in a persistent vegetative state has a constitutionally protected right to refuse unwanted medical treatment, including artificial nutrition and hydration, that a courtappointed guardian may consent to withdrawal of such treatment where it is in the "best interests" of the ward to do so, and that the guardian does not need the prior authority of the court, although that decision may be reviewed by the court at the instance of parties in interest. We stress that this opinion is limited in scope to persons in a persistent vegetative state.
The facts of this case are undisputed. On May 25, 1989, pursuant to sec. 880.33, Stats., L.E. Phillips Career Development Center, a not for profit corporation, was appointed guardian of the person and estate of L.W., a seventy-nine year old man. L.W. had a long history of chronic undifferentiated schizophrenia, and had been institutionalized since 1951. He had no close relatives or friends, and had never indicated his wishes concerning life-sustaining medical treatment to anyone. Evidence in *64 the record indicates that L.W. may never have been competent.
On May 31, 1989, L.W. suffered a cardiac arrest. He was moved from the Fairchild Nursing Home to St. Francis Medical Hospital in La Crosse. Later that week, L.W.'s attending physicians informed the guardian that L.W. was in a chronic, persistent vegetative state.[1] The physicians indicated that if L.W.'s condition did not improve within the following four weeks, they would request the guardian to consent to withdrawal of all lifesustaining medical treatment, including artificial nutrition and hydration, and thus occasion L.W.'s death.[2]
*65 On June 8, 1989, the guardian petitioned the circuit court for a declaratory judgment to determine whether either the guardian or the court had the authority to consent to such withdrawal. The court appointed Paul J. Lenz to act as guardian ad litem of L.W. The guardian, guardian ad litem, St. Francis Hospital, and Eau Claire County all filed briefs in the trial court.[3] The court heard oral argument from the parties regarding the legal issues involved in a withdrawal decision. The court heard no testimony regarding L.W.'s actual condition or whether L.W. ever expressed his wishes regarding medical treatment.
The trial court in its memorandum opinion concluded that a guardian has the authority to consent to withdrawal of all life-sustaining medical treatment, including artificial nutrition and hydration, without prior court order or approval, if withdrawal is determined by the guardian to be in the ward's best interests. The court set forth twelve criteria to guide the guardian's best interests determination.[4] While we do not disagree *66 with these criteria, we do not adopt them on this appeal for some are irrelevant to the record in this case.
The guardian ad litem appealed the trial court order, and the guardian and the Hospital cross-appealed. Helpful and detailed amicus briefs were filed by numerous organizations.
On February 3, 1991, while this appeal was pending, L.W. died of natural causes. Thus, to the extent that it can affect L.W. this action is moot. However, this court has recognized certain exceptions to the general rule of dismissal for mootness.
[T]his court has held that it will retain a matter for determination although that determination can have no practical effect on the immediate parties: Where the issues are of great public importance, State v. Seymour, 24 Wis. 2d 258, 261, 128 N.W.2d 680 (1964); where the constitutionality of a statute is involved, Doering v. Swoboda, 214 Wis. 481, 253 N.W. 657 (1934); where the precise situation under consideration arises so frequently that a definitive *67 decision is essential to guide the trial courts, Carlyle v. Karns, 9 Wis. 2d 394, 101 N.W.2d 92 (1960); where the issue is likely to arise again and should be resolved by the court to avoid uncertainty, Fine v. Elections Board, 95 Wis. 2d 162, 289 N.W.2d 823 (1980); or where a question was capable and likely of repetition and yet evades review because the appellate process usually cannot be completed and frequently cannot even be undertaken within the time that would have a practical effect upon the parties, In re Marriage of Sandy v. Sandy, 109 Wis. 2d 564, 566, 326 N.W.2d 761 (1982).
State ex rel. La Crosse Tribune v. Circuit Ct., 115 Wis. 2d 220, 229, 340 N.W.2d 460, 464 (1983). The issue of an individual's right to refuse life-sustaining medical treatment (LSMT) is of great public importance, and is capable of repetition but likely to evade review. The number of courts which have resolved this issue despite the death of the concerned patient bears this out. See Rasmussen by Mitchell v. Fleming, 154 Ariz. 207, 214 n.4, 741 P.2d 674, 681 (1987). Under the standards of La Crosse Tribune we exercise our discretion to address the merits and resolve the issues presented by the facts of this case.
[1]
The first issue presented is whether an incompetent individual such as L.W. has a right to refuse medical treatment. We conclude that an individual's right to refuse unwanted medical treatment emanates from the common law right of self-determination and informed consent, the personal liberties protected by the Fourteenth Amendment, and from the guarantee of liberty in Article I, section 1 of the Wisconsin Constitution.
*68 In 1891, the United States Supreme Court stated unequivocally that individuals have a right to selfdetermination:
No right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.
Union Pacific Ry. Co. v. Botsford, 141 U.S. 250, 251 (1891). Judge Cardozo expanded this notion to create the doctrine of informed consent:
Every human being of adult years and sound mind has a right to determine what shall be done with his own body; and a surgeon who performs an operation without his patient's consent, commits an assault, for which he is liable in damages.
Schloendorff v. Society of New York Hospital, 211 N.Y. 125, 129-30, 105 N.E. 92, 93 (1914). The logical corollary of the doctrine of informed consent is the right not to consentthe right to refuse treatment. Numerous courts have grounded the right to refuse treatment in whole or in part on the common-law right to self-determination and informed consent. See, e.g., Superintendent of Belchertown State School v. Saikewicz, 373 Mass. 728, 370 N.E.2d 417 (1977); In re Strorar, 52 N.Y.2d 363, 438 N.Y.S.2d 266, 420 N.E.2d 64, cert. denied, 454 U.S. 858 (1981); and In re Conroy, 98 N.J. 321, 486 A.2d 1209 (1985).
[3]
The United States Supreme Court recently held that a competent individual has a protected Fourteenth *69 Amendment liberty interest in refusing unwanted medical treatment. Cruzan v. Director, Missouri Department of Health,  U.S. , 110 S. Ct. 2841, 2851 (1990). The Court also assumed, but did not decide, that this liberty interest included the right to refuse artificial nutrition and hydration. Id. at 2852.
Article I, section 1 of the Wisconsin Constitution states:
All people are born equally free and independent, and have certain inherent rights; among these are life, liberty and the pursuit of happiness; to secure these rights, governments are instituted, deriving their just powers from the consent of the governed.
This independent right to liberty includes an individual's choice of whether or not to accept medical treatment.
The Wisconsin legislature has recognized the right to refuse unwanted medical treatment. The Natural Death Act, ch. 154, Stats., as amended on December 5, 1991, allows competent individuals to give specific instructions (by a "living will") regarding health care decisions, including the withholding or withdrawal of life-sustaining procedures and artificial nutrition and hydration, which physicians are bound to honor if the individual becomes incompetent. The Power of Attorney for Health Care Act, ch. 155, Stats., enacted in 1989, allows competent individuals to designate a health care agent to make health care decisions on their behalf should they become incompetent. These decisions include the withholding or withdrawal of all life-sustaining medical treatment. The statutes specifically provide that the failure to execute a living will or a power of attorney for health care creates no presumption regarding an individual's consent to the use of life-sustaining *70 medical treatment, or feeding tubes. See secs. 154.11(5) and 155.70(8), Stats.
[4]
Thus, the Wisconsin legislature has declared that in this state competent persons have a legislatively sanctioned right to refuse unwanted life-sustaining medical treatment.
An issue of first impression in this state is whether the right to refuse unwanted medical treatment includes a right to refuse artificial nutrition and hydration. We recognize, as other courts have, that the provision of food and water to one incapable of oral self-nourishment raises unique concerns. Unlike most medical technological advances of a mechanistic nature, it is difficult to view nourishment as anything but normal and essential human care. It is difficult not to view the withdrawal of artificial feeding as inducing death through starvation and dehydration.[5] There is however no compelling distinction between artificial feeding and other forms of medical treatment. As succinctly stated by the New Jersey Supreme Court:
Once one enters the realm of complex, high-technology medical care, it is hard to shed the "emotional symbolism" of food. However, artificial feedings such as nasogastric tubes, gastrostomies, and intravenous *71 infusions are significantly different from bottle-feeding or spoonfeedingthey are medical procedures with inherent risks and possible side effects, instituted by skilled health-care providers to compensate for impaired physical functioning. Analytically, artificial feeding by means of a nasogastric tube or intravenous infusion can be seen as equivalent to artificial breathing by means of a respirator. Both prolong life through mechanical means when the body is no longer able to perform a vital bodily function on its own.
Conroy, 98 N.J. at 372-373, 486 A.2d at 1236 (citations omitted). Nearly every state's final court to consider the issue has concluded that artificial feeding is medical treatment which may be refused.[6] We reach the same conclusion.
In Cruzan, the majority of the Supreme Court assumed, but did not decide, that individuals have a right to refuse artificial nutrition and hydration. Justice O'Connor, in concurrence, was more explicit:
Artificial feeding cannot readily be distinguished from other forms of medical treatment. See, e.g., Council on Ethical and Judicial Affairs, American *72 Medical Association, AMA Ethical Opinion 2.20, Withholding or Withdrawing Life-Prolonging Medical Treatment, Current Opinions 13 (1989); The Hastings Center, Guidelines on the Termination of Life-Sustaining Treatment and the Care of the Dying 59 (1987). Whether or not the techniques used to pass food and water into the patient's alimentary tract are termed "medical treatment," it is clear they all involve some degree of intrusion and restraint. . . . Requiring a competent adult to endure such procedures against her will burdens the patient's liberty, dignity, and freedom to determine the course of her own treatment. Accordingly, the liberty guaranteed by the Due Process Clause must protect, if it protects anything, an individual's deeply personal decision to reject medical treatment, including the artificial delivery of food and water.
Cruzan,  U.S. at , 110 S. Ct. at 2857 (O'Connor, J., concurring). Justice Brennan added in dissent: "The artificial delivery of nutrition and hydration is undoubtedly medical treatment." Id. at , 110 S. Ct. at 2866 (Brennan, J., dissenting).
The Wisconsin legislature has also recognized a competent individual's right to refuse artificial nutrition and hydration. Section 154.03(1), Stats., provides in part:
Any person of sound mind and 18 years of age or older may at any time voluntarily execute a declaration, which shall take effect on the date of execution, authorizing the withholding or withdrawal of lifesustaining procedures or of feeding tubes when the person is in a terminal condition or is in a persistent vegetative state.
Also, sec. 155.20(4), Stats., provides: "A health care agent may consent to the withholding or withdrawal of *73 nonorally ingested nutrition or hydration for the principal if the power of attorney for health care instrument so authorizes . .."
[5]
Consistent with the implied holding of the United States Supreme Court, and the specific declaration of the Wisconsin legislature, we conclude that an individual's right to refuse unwanted life-sustaining medical treatment extends to artificial nutrition and hydration.[7]
[6]
We further conclude that the right to refuse all unwanted life-sustaining medical treatment extends to incompetent as well as competent individuals.
The law must often adjust the manner in which it affords rights to those whose status renders them unable to exercise choice freely and rationally. Children, the insane, and those who are irreversibly ill with loss of brain function, for instance, all retain "rights," to be sure, but often such rights are only meaningful as they are exercised by agents acting with the best interests of their principals in mind. *74 Thompson v. Oklahoma, 487 U.S. 815, 825 n.23 (1988). An incompetent individual does not relinquish the right to refuse unwanted treatment by virtue of incompetency. In re Guardianship of Grant, 109 Wash. 2d 545, 554, 747 P.2d 445, 449 (1987); Rasmussen, 154 Ariz. at 219, 741 P.2d at 686 ("Other jurisdictions have unanimously concluded that the right to refuse medical treatment is not lost merely because the individual has become incompetent and has failed to preserve that right."). The existence and viability of a long established personal right does not hinge upon its prescient exercise, nor is it extinguished when one is adjudged incompetent.
[7]
The guardian ad litem argues that this court should require clear and convincing evidence of the individual's wishes while competent concerning life-sustaining care, as set forth by the majority in Cruzan, before treatment may be withheld. We disagree. Relatively few individuals provide explicit written or oral instructions concerning their treatment preferences should they become incompetent.[8] The reasons for this are undoubtedly myriad: *75 ignorance, superstition, carelessness, sloth, procrastination or the simple refusal to believe it could happen to oneself. This failure to act is not a decision to accept all treatment, nor should society's increasing ability to prolong the dying process make it one. To adopt the clear and convincing standard would doom many individuals to a prolonged vegetative state sustained in a life form by unwanted, perhaps detrimental, means that are contrary to the person's best interest. Moreover the legislature in the adoption of chs. 154 and 155, Stats., carefully pointed out that failure to execute a living will or power of attorney for health care creates no presumption that the person consents to the use or withholding of lifesustaining procedures.
Thus the stated legislative policy is to leave the decision, if not declared by the patient, to be determined as a matter of common lawand the common law, where the individual was never competent or where the conduct of the individual while competent never was of a kind from which one could draw a reasonable inference upon which to make a substituted judgment, requires *76 that decision to be resolved by a surrogate decision maker acting in the best interests of the incompetent.
[8-10]
Turning to this case, the record indicates that L.W. may never have been competent. The right to refuse unwanted treatment must also extend to those who have never been competent. While "free choice" to exercise a right is an empty option for lifelong incompetents, see In re Guardianship of Eberhardy, 102 Wis. 2d 539, 573, 307 N.W.2d 881, 893 (1981), this does not strip such individuals of basic rights, nor does it render them "passive subjects of medical technology." Cruzan,  U.S. at , 110 S.Ct. at 2876 (Brennan, J., dissenting). An incompetent is a ward of the state, and this state's parens patriae power requires this court to ensure that the ward's best interests are protected.[9] We conclude that in some circumstances it may well be in the patient's best interest to have treatment withheld or withdrawn. A dignified and natural death may outweigh the interest of maintaining a physiological life as long as medically possible. Therefore, where it is in the best interest of an incompetent person in a persistent vegetative state to refuse life-sustaining medical treatment, his or her right to refuse must be exercised by a surrogate decisionmaker.
As stated by the New York Supreme Court (Appellate Division):

*77 [B]y standards of logic, morality and medicine the terminally ill should be treated equally, whether competent or incompetent. Can it be doubted that the "value of human dignity extends to both"? What possible societal policy objective is vindicated or furthered by treating the two groups of terminally ill differently? What is gained by granting such a fundamental right only to those who, though terminally ill, have not suffered brain damage and coma in the last stages of the dying process? The very notion raises the spectre of constitutional infirmity when measured against the Supreme Court's recognition that incompetents must be afforded all their due process rights; indeed any State scheme which irrationally denies to the terminally ill incompetent that which it grants to the terminally ill competent patient is plainly subject to constitutional attack.
Eichner v. Dillon, 73 A.D.2d 431, 464-465, 426 N.Y.S.2d 517, 542-543 (N.Y. App. Div. 1980) (citations omitted) (emphasis in original). We find no reason to differentiate between the rights of the competent and incompetent. To the extent that it is possible, both must be assured the benefit of the exercise of the same constitutional right of choice.
Following the opinion of In re Quinlan, 70 N.J. 10, 355 A.2d 647 (1976), cert. denied, 429 U.S. 922 (1976), courts have split on the standards applicable to surrogate decisionmaking. In Quinlan, the father of Karen Quinlan sought judicial approval to disconnect his daughter's respirator. Karen existed in a persistent vegetative state. The New Jersey Supreme Court allowed the father, as guardian, and the family the authority to disconnect the respirator if they determined that Karen would have chosen to do so in the circumstances. This "substituted *78 judgment" test has been adopted by numerous courts.[10]
[11]
This court has heretofore refused to adopt a substituted judgment test when an incompetent's right must be exercised, if at all, by a surrogate in circumstances where there was no way a surrogate decision maker could divine what the ward would have preferred to do in the circumstance. In re Guardianship of Pescinski, 67 Wis. 2d 4, 7-8, 226 N.W.2d 180, 181-182 (1975); Eberhardy, 102 Wis. 2d at 564-67, 307 N.W.2d at 893-894. In Eberhardy, we explained:
[T]he question is not choice because it is sophistry to refer to it as such, but rather the question is whether there is a method by which others, acting in behalf of the person's best interests and in the interests, such as they may be, of the state, can exercise the decision.
Id. at 566, 307 N.W.2d at 893. In this case, where L.W. did not execute a living will or power of attorney for health care instrument, and never expressed his wishes regarding life-sustaining medical treatment, and in all probability never had the competency to do so, the guardian must decide whether it is in the patient's best interests to have life-sustaining medical treatment withheld or withdrawn.[11]
*79 [12]
Certainly the patient's wishes, as far as they can be discerned, are an appropriate consideration for the guardian. If the wishes are clear, it is invariable as a matter of law, both common and statutory, that it is in the best interests of the patient to have those wishes honored, for the patient has made the pre-choice of what he or she considers to be the best interests under the *80 circumstances that arise. Where, as here, there is little or no evidence of a patient's wishes, the guardian must determine what is presently in the patient's best interests. Unlike a substituted judgment, which necessarily involves considerations of the patient's past wishes, values, feelings and beliefs, the best interests standard focuses solely on what is currently in the patient's best interests.
Other courts considering withdrawal decisions for incompetent patients with no prior directives have also concluded that a best interests analysis is proper. In Rasmussen, supra, the Supreme Court of Arizona considered whether a public fiduciary, appointed as guardian of an incompetent woman, could consent to the withdrawal and withholding of life-sustaining medical treatment. The court concluded:
Where no reliable evidence of a patient's intent exists, as here, the substituted judgment standard provides little, if any, guidance to the surrogate decisionmaker and should be abandoned in favor of the "best interests" standard.
Rasmussen, 154 Ariz. at 222, 741 P.2d at 689.[12]
*81 [13]
The President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research (President's Commission) also concluded that in the absence of written or oral instructions, withdrawal and withholding decisions must be made by utilization of the "best interests" standard. Noting that in the absence of reliable evidence of patient's wishes surrogates are unable to make a valid substituted judgment, the Commission concluded:
In these situations . . . [surrogate decisionmakers] must try to make a choice for the patient that seeks to implement what is in that person's best interests by reference to more objective, societally shared criteria. Thus the best interests standard does not rest on the value of self-determination but solely on protection of patients' welfare.
President's Commission, Deciding to Forego Life-Sustaining Treatment, 134-135 (1983). We also hold that in a case such as this one where there can be no reliable ascertainment of the incompetent's wishes, only the best interests standard can be applied. We are fully in accord with the circuit court's conclusion in this respect.
[14]
In the circumstances of this proceeding the guardian ad litem and others have challenged the statutory authority of a guardian to make any decision to withhold or withdraw life-sustaining medical treatment. Pursuant to ch. 880, Stats., court appointed guardians fulfill the parens patriae duty of the state to protect the best interests *82 of an incompetent ward.[13] Consequently, where it is in the best interests of the ward to withhold or withdraw treatment, the guardian has not only the authority to but a duty to consent to the withholding or withdrawal of treatment.
[15]
The interrelationship between chs. 155 and 880, Stats., also evidences a guardian's authority to consent to the withholding or withdrawal of treatment. Section 880.33(3), Stats., states: "If the proposed incompetent has executed a power of attorney for health care under ch. 155, the court shall give consideration to the appointment of the health care agent for the individual as the individual's guardian." Coupled with sec. 155.60(2), Stats.,[14] which invalidates the health care power of attorney instrument where a guardian is appointed unless otherwise ordered by the court, the clear indication is that a guardian has identical decisionmaking powers as a health care agent. To construe the sections any other way would result in an individual losing his or her expressed right to refuse treatment upon appointment *83 of a guardian; such a construction would render sec. 155.60(2), Stats., unconstitutional, and is rejected.
The guardian ad litem correctly asserts that a guardian is a state actor. A guardian's authority derives from the state's parens patriae power and is purely statutory. Thus, the patient must be accorded due process before the state may deprive him or her of life. U.S. Const, amend. XIV, Wis. Const. art. I, sec. 1. But to assume that withdrawing life-sustaining medical treatment deprives a ward of life begs the question.
In this case, due process initially is accorded through the guardianship appointment procedures. Section 880.33, Stats., sets forth extensive procedures for the determination of incompetency and appointment of a guardian, and sec. 880.331, Stats., requires that a disinterested attorney be appointed as guardian ad litem to protect the individual's interests in the appointment procedure.
[16]
Moreover, we do not view the withdrawal of lifesustaining treatment as depriving the patient of life; rather, it "allows the disease to take its natural course." Conroy, 98 N.J. at 351, 486 A.2d at 1224. See also sec. 155.70(7), Stats., which states that the withholding or withdrawal of health care "permit[s] the natural process of dying." No one can dispute that the withdrawal of treatment, especially artificial feeding, will result in the death of the patient. However, it is equally indisputable that the result is the natural death of the body, as contrasted to the unnatural prolongation of, in this case, a vegetative state. The state does not deprive an individual of life by failing to ensure that every possible technological medical procedure will be used to maintain that life.
The basic issue in this case is not whether lifesustaining medical treatment can be withdrawn, for that *84 is a constitutional and common law right of a sui juris individual, the issue is how that right can be exercised when the ward, being in a persistent vegetative state, cannot presently make that decision and, under the particular facts here, may never have been competent to make the decision to refuse life-sustaining medical treatment.
[17]
In conclusion then we hold that a guardian may consent to the withholding or withdrawal of life-sustaining medical treatment on behalf of one who was never competent, or a once competent person whose conduct never was of a kind from which one could draw a reasonable inference upon which to make a substituted judgment, when:
(1) the incompetent patient's attending physician, together with two independent neurologists or physicians, determine with reasonable medical certainty that the patient is in a persistent vegetative state and has no reasonable chance of recovery to a cognitive and sentient life;[15] and

*85 (2) the guardian determines in good faith that the withholding or withdrawal of treatment is in the ward's best interests, according to the objective factors outlined below.[16]
*86 [18]
In making the best interests determination, the guardian must begin with a presumption that continued life is in the best interests of the ward. Whether that presumption may be overcome depends upon a good faith assessment by the guardian of several objective factors.
[19]
Objective factors the guardian may consider include:
[T]he degree of humiliation, dependence, and loss of dignity probably resulting from the condition and treatment; the life expectancy and prognosis for recovery with and without treatment; the various treatment options; and the risks, side effects, and benefits of each of those options.
Conroy, 98 N.J. at 363-364, 486 A.2d at 1231. For an incompetent patient in a persistent vegetative state, such as L.W., there may be a point at which as objectively viewed it is in his or her best interests to refuse further medical treatment. As Justice Handler of the Supreme Court of New Jersey poignantly expressed:
The presence of progressive, irreversible, extensive, and extreme physical deterioration, such as ulcers, lesions, gangrene, infection, incontinence and the *87 like, which frequently afflict the bed-ridden, terminally ill, should be considered . . . . The medical and nursing treatment of individuals in extremis and suffering from these conditions entails the constant and extensive handling and manipulation of the body. At some point, such a course of treatment upon the insensate patient is bound to touch the sensibilities of even the most detached observer. Eventually, pervasive bodily intrusions, even for the best motives, will arouse feelings akin to humiliation and mortification for the helpless patient. When cherished values of human dignity and personal privacy, which belong to every person living or dying, are sufficiently transgressed by what is being done to the individual, we should be ready to say: enough.
Conroy, 98 N.J. at 398-399,486 A.2d at 1249-50 (Handler, J., concurring in part and dissenting in part).[17]
*88 [20]
We emphasize at this point that the guardian must assess these factors from the standpoint of the patient, and should not substitute his or her own view of the "quality of life" of the ward. As the Rasmussen court explained, the guardian's determination of what is in the ward's best interests necessarily involves an assessment of "`the value that the continuation of life has for the patient," but should not involve "`the value that others find in the continuation of the patient's life . . " Rasmussen, 154 Ariz. at 222 n.23, 741 P.2d at 689, citing President's Commission, Deciding to Forego Life-Sustaining Treatment, 135 n.43. The guardian should not engage in a subjective "quality of life" determination on behalf of the ward. As explained in Conroy:
We do not believe that it would be appropriate for a court to designate a person with the authority to determine that someone else's life is not worth living simply because, to that person, the patient's `quality of life' or value to society seems negligible. . . . More wide-ranging powers to make decisions about other people's lives, in our view, would create an intolerable *89 risk for socially isolated and defenseless people suffering from physical or mental handicaps.
Conroy, 98 N.J. at 367, 486 A.2d at 1233.
Another possible factor to consider is the opinion of a "bioethics" or "institutional ethics" committee. Quinlan, 70 N.J. at 49-51, 355 A.2d at 668-669. Increasingly, health care facilities such as hospitals and nursing homes are creating bioethics committees. In 1990, the American Hospital Association estimated that over 60 percent of United States hospitals had formed bioethics committees.[18] Generally, these committees help establish hospital policies on medical-ethical issues, and advise, discuss, or consult with health care professionals, patients, and their families and representatives about medical and ethical decisions.[19]
[21]
The record in this case indicates that the Bioethics Committee of the Franciscan Health System unanimously concluded that it was appropriate to forego life support on a patient such as L.W. who is in a persistent vegetative state. Certainly if such a committee is available, the guardian should request it to review the decision, and should consider its opinion in determining whether it is in the patient's best interests to forego treatment.
We point out in footnote 20, infra at 92-93 that a "spouse, next of kin or close friend or associate over a significant period of time" is entitled to notice of termination of life-sustaining medical treatment procedures. *90 Accordingly a guardian should if possible consider the opinion of those persons in concluding what is in the best interests of the ward.
In sum, the guardian must determine in good faith and based upon the objective criteria set forth above whether it is in the patient's best interests to accept or refuse life-sustaining medical treatment, and act accordingly.
[22]
The right to refuse treatment, when exercised by a guardian, must be balanced against relevant state interests. Cruzan,  U.S. at , 110 S.Ct. at 2851-52. Courts have identified four relevant state interests: (1) preserving life; (2) safeguarding the integrity of the medical profession; (3) preventing suicide; and (4) protecting innocent third parties. Conroy, 98 N.J. at 348, 486 A.2d at 1223.
[23]
The interest in preserving life is the most significant of the four. As stated in Cruzan:
[T]here can be no gainsaying this interest. As a general matter, the Statesindeed, all civilized nationsdemonstrate their commitment to life by treating homicide as serious crime.
 U.S. at , 110 S. Ct. at 2852. This interest embraces both the interest in preserving the patient's life and the interest in preserving the sanctity of all life. Conroy, 98 N.J. at 348, 486 A.2d at 1223. However, this interest weakens as the degree of bodily intrusion increases and the chance of recovery wanes. Rasmussen, 154 Ariz. at 216-217, 741 P.2d at 683-684; Quinlan, 70 N.J. at 41, 355 A.2d at 664. At a certain point, treatment serves only to prolong the dying process unnaturally, and at this point the patient's liberty interest in refusing treatment *91 prevails. An unqualified state interest in preserving life irrespective of either a patient's express wishes or of the patient's best interests transforms human beings into unwilling prisoners of medical technology.
[24]
The state's interest in protecting the integrity of the medical profession is not implicated in this case. L.W.'s physicians initiated the action by conditionally (i.e., if L.W.'s condition remained unchanged for another four weeks) requesting the guardian's consent to withdraw treatment. Their actions were consistent with current medical ethics in so far as approval was sought and given by the Bioethics Committee of Franciscan Health System. Current Opinions of the Council on Ethical and Judicial Affairs of the American Medical Association 2.18, "Withholding or Withdrawing Life-Prolonging Medical Treatment" (1986); Position of the American Academy of Neurology on Certain Aspects of the Care and Management of the Persistent Vegetative State Patient, 39 Neurology 125 (1989). Thus, a decision to withhold or withdraw treatment will not impugn the integrity of the profession. Indeed, the existence of a protected right to refuse treatment for all individuals competent or incompetent may in a sense protect the integrity of the medical profession. In the absence of such a protected right; physicians may be discouraged from attempting certain life-sustaining medical procedures in the first place, knowing that once connected they may never be removed. Conroy, 98 N.J. at 370, 486 A.2d at 1234. The existence of this right will prevent premature and rash decisions to allow a patient to die, and will remove the potential conflict for the medical profession between ordinary compassion and the Hippocratic Oath.
*92 [25]
The third asserted state interest, preventing suicide, is also not implicated in this case. Refusing medical treatment is not suicide. In sec. 154.11(1), Stats., the legislature states specifically: "The withholding or withdrawal of life-sustaining procedures or feeding tubes from a qualified patient under this chapter does not, for any purpose, constitute suicide." Section 155.70(1)(a), Stats., likewise provides: "The making of a health care decision on behalf of a principal under the principal's power of attorney for health care instrument does not, for any purpose, constitute suicide."
The fourth asserted state interest, protecting innocent third parties, is also not implicated on the record. L.W. had no children, no immediate family, and a decision to forego treatment would affect no innocent third parties. Rasmussen, 154 Ariz. at 218, 741 P.2d at 685.
[26-28]
We also hold that court approval of the guardian's decision is not required. The judicial process, as noted by the Washington Supreme Court, is "an unresponsive and cumbersome mechanism for decisions of this nature." Colyer, 99 Wash. 2d at 127, 660 P.2d at 738. See also Matter of Jobes, 108 N.J. 394, 423-424, 529 A.2d 434, 449 (1987). Court review, however, remains appropriate and available where any interested party objects to the decision of the guardian.[20] Where the guardian's decision *93 is challenged, the presumption is that continued life is in the best interests of the ward, and the burden rests upon the guardian to show both the existence of a persistent vegetative state to a high degree of medical certainty and that the decision to withhold or withdraw treatment is in the ward's best interests and was made in good faith.
We affirm the trial court's order that the guardian, L.E. Phillips Career Development Center, has the authority to consent to the withholding or withdrawal of all life-sustaining medical treatment, including artificial nutrition and hydration, on behalf of L.W., a ward who *94 is in a persistent vegetative state, where it has determined in good faith that withholding or withdrawal of such treatment is in the ward's best interests. For the reasons stated, and because of the narrow focus of this decision, we do not herein accept the trial court criteria, supra, note 1, and hold that the best interests determination is to be made on objective criteria concerning the personal best interests of the patient.
By the Court.Order affirmed.
LOUIS J. CECI, J. (concurring.)
I join in the decision and result reached by the court today and write separately only to emphasize that physicians must comply with current medical practice in diagnosing whether a patient is in a persistent vegetative state. As noted by the majority opinion, an accurate diagnosis of persistent vegetative state is usually considered to be possible only after three months. Majority op. at , n. 2 (citing Guidelines for State Court Decision Making in Authorizing or Withholding Life-Sustaining Medical Treatment (National Center for State Courts 1991)). When considering whether to withdraw life-sustaining medical treatment (LSMT), physicians must not prematurely diagnose a patient as being in a persistent vegetative state. We allow the withdrawal of LSMT today under very limited circumstances. The diagnosis of persistent vegetative state must be by evidence which is clear and convincing. We are, after all, dealing with the death of a human being. I concur.
STEINMETZ, J. (dissenting.)
I dissent from the majority opinion for the reasons that follow. First, the present case is moot. A case is moot when a final determination has no practical effect upon the existing controversy. State ex rel. McDonald v. Douglas Cty, Cir. Ct., *95 100 Wis. 2d 569, 572, 302 N.W.2d 462 (1981). L.W. passed away while his case was pending on appeal. Consequently, a final determination has no practical effect upon L.W.'s controversy. Although this court has the authority to decide an issue when a matter has become moot as to the parties before it, I believe we should not have granted the motion for continuation after his death.[1]
I also believe that this court should not be ruling on whether to withhold life-sustaining health care.[2] Ultimately, such matters should be decided by the legislature following significant public input.[3] Public hearings *96 would generate ideas and suggestions from health care professionals, administrators, social workers, guardians, legal professionals, and others which should be considered in developing a law that offers guidance for making difficult health care decisions on behalf of incompetent individuals in a persistent vegetative state.[4]
The Wisconsin legislature has recognized the right to refuse unwanted medical treatment. The Natural Death Act, ch. 154 Stats., as amended on December 5, 1991, allows competent individuals to give specific instructions regarding health care decisions through a *97 "living will."[5] Such instructions may pertain to the withholding or withdrawal of life-sustaining procedures and artificial nutrition and hydration which physicians are bound to honor if the individual becomes incompetent. Furthermore, the Natural Death Act offers an individual certain protection. For example, life-sustaining procedures are withheld only when specified humane circumstances exist, including nutrition and protection from pain.[6] This court's decision, however, does not offer such humane considerations.
The Power of Attorney for Health Care Act, ch. 155, Stats., enacted in 1989, allows competent individuals to designate a health care agent to make health care decisions on their behalf should they become incompetent. These decisions include the withholding or withdrawal of life-sustaining medical treatment. Again, the legislature has provided individuals with protection. Section 155 provides that even if the person indicates that his or her agent is allowed to have ingested nutrition and hydration withheld or withdrawn, the instructions cannot be acted on if "the principal's attending physician *98 advises that, in his or her professional judgment, the withholding or withdrawal will cause the principal pain or reduce the principal's comfort." See sec. 155.20(4). Again, similar considerations are not given to incompetents in this court's decision.
The majority's lack of foresight in offering protection to incompetent individuals supports the need for the legislature to conduct hearings and write a comprehensive law with guidelines, safeguards, and humane considerations.[7] Studies can be utilized in deciding whether the withdrawal of nutrition and hydration causes discomfort or pain.[8] In the present case, the majority offers no data suggesting that an individual in a persistent vegetative state will not experience discomfort or pain when his/her body is dehydrating or starving to death. In fact the majority states, "it is difficult to view *99 nourishment as anything but normal and essential human care." Majority op. at .
The majority labels death by dehydration or starvation as a "dignified and natural death [which] may outweigh the interest of maintaining a physiological life as long as medically possible." Majority op. at . It surely is not a warranted conclusion from the record in this case where the man died before the guardian's decision could be tested. Only health care providers who have observed an individual dying from dehydration or starvation can state whether the death is dignified and natural. Health care providers can offer such helpful information at legislative hearings.
I believe the majority's assumption that an individual's right to refuse unwanted life-sustaining medical treatment extends to artificial nutrition and hydration is unwarranted and misconceived. First of all, the United States Supreme Court has not directly ruled on the subject.[9] Even the majority states that " [i]n Cruzan, the majority of the Supreme Court assumed, but did not decide, that individuals have a right to refuse artificial nutrition and hydration." Majority op. at . Secondly, as described above, the Wisconsin legislature has consistently required comfort and freedom from pain in actions related to health care.
According to the majority in the present case, the guardian does not need prior authority of the court to withdraw life sustaining health care. It is recognized that the decision may be reviewed by the court at the insistence *100 of a party or parties in interest. However, the majority fails to define "parties in interest."[10] In L.W.'s case, the guardian ad litem opposed withdrawing food and water. Without the guardian ad litem, the case never would have been reviewed in court since the incompetent had no family or friends to demand the court to review the guardian's decision.
Finally, I dissent because this is a poor case for the court to rule on this life and death issue due to the premature diagnosis of L.W.'s condition. L.W. was diagnosed as being in a persistent vegetative state within four weeks after he suffered cardiac arrest. For an accurate diagnosis, it is conceded it should be made no earlier than three months after the commencement of the persistent vegetative state. Moreover, the trial court heard no testimony regarding L.W.'s actual condition which must be a requirement if the matter gets to court. These actions may encourage a premature diagnosis while a decision is proceeding.[11]
*101 Presumptions favoring life should continue to control life and death decisions until legislative guidelines are formulated. The circumstances and tests required in a decision to remove life sustaining health care, the burden of proof necessary, notice of the hearing to decide removal of life sustaining procedures to family, friends and other necessary parties, and which doctors should be on a committee to recommend the withdrawal of life sustaining care should be left to the legislature to decide following extensive studies and hearings.
Because of the aforementioned reasons, I dissent.
NOTES
[1] The following characteristics of persistent vegetative state are derived from Guidelines for State Court Decision Making in Authorizing or Withholding Life-Sustaining Medical Treatment, National Center for State Courts 1991, Appendix B, "Major Neurological Syndromes in LSMT Cases":

Basic Definition: Irreversible loss of all neocortical functions; brain stem functions intact.
Clinical Syndrome: Awake, but unaware; eyes-open unconsciousness; sleep/wake cycles present; respirator independence.
Anatomic Substrate of Neurologic Damage: Varies, but most commonly extensive destruction of neocortex (hypoxic-ischemic encephalopathy) or subcortial white matter (head trauma).
Onset and Course: Sudden onset, secondary to hypoxicischemic insult or acute head trauma.
Prognosis for Survival in Terms of Cardio-Respiratory Functions: Usually long-term, years or even decades.
Time When Prognosis for Recovery of Neurologic Functions Can Be Determined with a High Degree of Certainty: Varies by cause; in hypoxic-ischemic encephalopathy, usually 1-3 months; in head trauma, usually 6-12 months.
Degree of Physical or Psychologic Suffering: None.
[2] According to the Guidelines, an accurate diagnosis of persistent vegetative state is usually considered to be possible only after three months. Because L.W. remained in a persistent vegetative state until his death in 1991, the premature diagnosis of persistent vegetative state is not an issue here.
[3] The propriety of the appointment of a guardian ad litem is challenged by respondent-cross appellant St. Francis Medical Center, because it is contended there were no issues on which the parties were adverse in these proceedings. St. Francis, of course, does not challenge the appropriateness of a guardian ad litem in the original determination of incompetency. L.W. was found to be incompetent almost forty years prior to this proceeding.
[4] (1) Whether the ward ever expressed any views regarding life-sustaining treatment.

(2) The wishes of the family.
(3) An independent medical opinion.
(4) The recommendation, if any, of a bioethics committee.
(5) The chances of physical recovery.
(6) The chances of mental recovery.
(7) The likelihood of physical, psychological or emotional injury as a result of providing or not providing treatment.
(8) The likelihood and duration of survival without treatment.
(9) The physical effects of prolonged treatment.
(10) The benefits of continued life with and without treatment.
(11) The motives of those supporting withdrawal.
(12) Any other factors bearing on the best interests of the ward.
[5] See, e.g., Cruzan by Cruzan v. Harmon, 760 S.W.2d 408, 423 (Mo. banc 1988), aff d, Cruzan v. Director, Missouri Department of Health, U.S. ,110 S. Ct. 2841 (1990); and Dolan, Death by Deliberate Dehydration and Starvation: Silent Echoes of the Hungerhauser, 7 Issues in Law & Medicine 173, 174 (1991) ("It is a remarkable circumstance that, in a nation whose wealth and resources are so vast as nearly to defeat the imagination, scholarly conferences, articles in learned journals, and courts ponder the question whether we can be justified in deliberately causing death by withholding food and water.").
[6] Rasmussen by Mitchell v. Fleming, 154 Ariz. 207, 741 P.2d 674 (1987); In re Drabick, 200 Cal. App. 3d 185, 245 Cal. Rptr. 840 (1988), cert. denied, 488 U.S. 958; In re Guardianship of Browning, 568 So.2d 4 (Fla. 1990); In re Estate of Longeway, 133 Ill. 2d 33, 549 N.W.2d 292 (1989); In re Lawrance, 579 N.E.2d 32, 40-41 (Ind. 1991); In re Gardner, 534 A.2d 947 (Me. 1987); Brophy v. New England Sinai Hospital, Inc., 398 Mass. 417, 497 N.E.2d 626 (1986); Gray v. Romeo, 697 F. Supp. 580 (D.R.I. 1988); In re Guardianship of Grant, 109 Wash. 2d 545, 747 P.2d 445 (1987). But see, Cruzan by Cruzan v. Harmon, 760 S.W.2d 408, 423-24 (Mo. banc. 1988), aff d, Cruzan v. Director, Missouri Department of Health,  U.S. , 110 S. Ct. 2841 (1990).
[7] The dissent asserts that this conclusion is "unwarranted and misconceived" because Cruzan did not decide the issue and because the Wisconsin legislature "has consistently required comfort and freedom from pain in actions related to health care." Dissenting Op. at 99. It is clear that we base our conclusion that artificial nutrition and hydration is medical treatment which may be refused primarily on the fact that it is indistinguishable from other forms of treatment and not on the ambivalence of the Cruzan majority. Also, as indicated infra at 87-88 n. 17, patients in a persistent vegetative state are incapable of experiencing pain or suffering, and thus to the extent that secs. 154.03(2)(b)4 and 155.20(4), Stats., indicate that a patient's pain or comfort affects an individual's right to refuse artificial feeding, that reasoning is inapplicable to this case.
[8] 2 President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research, Making Health Care Decisions 241-242 (1982) (36% of those surveyed gave instructions regarding how they would like to be treated if they ever became too sick to make decisions; 23% put those instructions in writing) (Lou Harris Poll, September 1982); American Medical Association Surveys of Physician and Public Opinion on Health Care Issues 29-30 (1988) (56% of those surveyed had told family members their wishes concerning the use of life-sustaining treatment if they entered an irreversible coma; 15% had filled out a living will specifying those wishes). (Cruzan,  U.S. at  n.1, 110 S. Ct. at 2857 n.1 (O'Connor, J., concurring)).

Congress has recognized this problem. Effective December 1, 1991, health care providers receiving federal benefits are required to provide to all adults receiving medical care written information regarding "an individual's rights under State law (whether statutory or as recognized by the courts of the State) to make decisions concerning such medical care, including the right to accept or refuse medical or surgical treatment and the right to formulate advance directives . . .." 42 U.S.C.A. § 1396a(w)(1) (West Supp. 1991). In addition, Congress mandated a "Public Education Campaign" concerning advance directives, declaring in part that:
The Secretary, no later than 6 months after the date of enactment of this section, shall develop and implement a national campaign to inform the public of the option to execute advance directives and of a patient's right to participate and direct health care decisions.
Requirements for Advanced Directives Under State Plans for Medical Assistance, Pub. L. No. 101-508, § 4751.
[9] Parens patriae literally means "parent of the country" and refers to the role of the state as guardian of persons under legal disabilities, such as juveniles or incompetent persons. Black's Law Dictionary 1114 (6th ed. 1990). Under the theory of parens patriae it is the right and duty of the state to step in and act in what appears to be the best interests of the ward. See In re Guardianship of Eberhardy, 97 Wis. 2d 654, 659 n.6, 294 N.W.2d 540 (Ct. App. 1980).
[10] In re Browning, 568 So.2d 4 (Fla. 1990); In re Estate of Greenspan, 137 Ill.2d 1, 558 N.E.2d 1194 (1990); Brophy v. New England Sinai Hospital, Inc., 398 Mass. 417, 497 N.E.2d 626 (1986); In re Strorar, 52 N.Y.2d 363, 420 N.E.2d 64, 438 N.Y.S.2d 266 (1981), cert. denied, 454 U.S. 858; In re Colyer, 99 Wash. 2d 114, 660 P.2d 738 (1983).
[11] In Eberhardy, this court declined to exercise the court's authority to make a determination of whether it was in Joan Eberhardy's best interests to be sterilized, noting that with respect to such an irreversible procedure, the best interests analysis is "inadequate unless there is an authoritative declaration of public policy to guide the exercise of that irreversible discretionary act." 102 Wis. 2d at 568, 307 N.W.2d at 894. The guardian ad litem argues that the present case is no different. We disagree. The crucial difference is that in this case a positive constitutional right is at issue, and we may not decline to address that right. Moreover, the legislature in chs. 154 and 155, Stats., clearly established the public policy of this state that all competent individuals have a right to refuse unwanted life-sustaining medical treatment.

It should be recalled that both Pescinski and Eberhardy were cases in which there was no way of ascertaining even an intimation of the incompetent's wisheshence it would have been impossible for a surrogate to exercise a judgment that purported to carry out the wishes of the ward. But neither of these cases should be construed to mean that a surrogate decision maker could not make a substituted judgment or decision that was designed to carry out the wishes of the incompetent if the incompetent's wishes were knowable. A substituted judgment is not conceived to be solely the judgment of the surrogate, but the judgment of the ward exercised by a surrogate who has sufficient information derived from past history of the ward when competent to reasonably ascertain what the decision of the ward would be were he or she presently competent to make the required decision. To hold that all substituted judgments are ipso facto rejected would probably constitute an unconstitutional holding for it would deprive an incompetent of the constitutional right of choicea right that is universally recognized when the choice is ascertainable.
[12] See also Conroy, 98 N.J. at 364-365, 486 A.2d at 1231 ("An incompetent, like a minor child, is a ward of the state, and the state's parens patriae power supports the authority of its courts to allow decisions to be made for an incompetent that serve the incompetent's best interests, even if the person's wishes cannot be clearly established."); Grant, 109 Wash. 2d at 567-568, 747 P.2d at 457 ("in such cases, the guardian must make a good faith determination of whether the withholding of life sustaining treatment would serve the incompetent patient's best interests."); Drabick, 245 Cal. Rptr. at 857 ("Acknowledging that the patient's expressed preferences are relevant, it is enough for the conservator, who must act in the conservatee's best interests, to consider them in good faith."); and In re Guardianship to Hamlin, 102 Wash. 2d 810, 820, 689 P.2d 1372, 1378 (1984). See generally Stewart G. Pollock, Life and Death Decisions: Who Makes Them and by What Standards, 41 Rutgers L. Rev. 505 (1989).
[13] Chapter 880, Stats., Guardians and Wards, is replete with admonitions that the guardian's decisions be in the "best interest" of the ward, e.g., secs. 880.33(5), 880.331(3) and 880.39, Stats.
[14] Section 155.60(2), Stats., provides:

If a court under s. 880.33 determines that an individual who is a principal is incompetent or makes a finding of limited incompetency under s. 880.33(3) and appoints a guardian for the individual, the power of attorney for health care executed under this chapter by the principal is revoked and the power of attorney for health care instrument is invalid, unless the court finds that the power of attorney for health care and power of attorney for health care instrument should remain in effect. If the court makes this finding, the guardian for the individual may not make health care decisions for the ward that may be made by the health care agent, unless the guardian is the health care agent.
[15] Section 154.01(5m), Stats., provides:

"Persistent vegetative state" means a condition that reasonable medical judgment finds constitutes complete and irreversible loss of all of the functions of the cerebral cortex and results in a complete, chronic and irreversible cessation of all cognitive functioning and consciousness and a complete lack of behavioral responses that indicate cognitive functioning, although autonomic functions continue.
See also Guidelines for State Court Decision Making in Authorizing or Withholding Life-Sustaining Medical Treatment, Appendix B, supra, n.1. This is a medical decision, not a legal one, and implicates a court only to the extent that any medical opinion under appropriate circumstances is evaluated by a court.
We stress the unique status of individuals in a persistent vegetative state, and the fact that this opinion is strictly limited to persons in such a condition. As the President's Commission concluded:
The primary basis for medical treatment of patients is the prospect that each individual's interests (specifically, the interest in wellbeing) will be promoted. Thus, treatment ordinarily aims to benefit a patient through preserving life, relieving pain and suffering, protecting against disability, and returning maximally effective functioning. If a prognosis of permanent unconsciousness is correct, however, continued treatment cannot confer such benefits. Pain and suffering are absent, as are joy, satisfaction, and pleasure. Disability is total and no return to an even minimal level of social or human functioning is possible.
Deciding to Forego Life-Sustaining Treatment, 181-182. Patients in a persistent vegetative state are on a completely different footing than patients with other disabilities. See also infra, at 87-88 n.17.
[16] We do not decide today whether a family member may consent to the withholding or withdrawal of life-sustaining medical treatment from a patient, because that question is not before us. Our review is limited to whether a court appointed guardian, where there can be no familial decisional process, may consent to the withholding or withdrawal of such treatment from a patient in a persistent vegetative state. We in no way impugn the thoughtful criteria set forth by the trial judge but we do not affirm them because some of them are not germane to the facts before us and to the narrow scope of this opinion.

We point out however that the Guidelines for State Court Decision Making in Authorizing or Withholding Life-Sustaining Medical Treatment note that the American Hospital Association estimates that 70% of the estimated 6,000 deaths that occur daily in the United States are somehow timed or negotiated with patient family and doctors quietly agreeing on not using death delaying technology. Guidelines, p. 17 n.40. Cruzan, U.S. at  110 S. Ct. at 2864, states that " [o]f the approximately two million people who die each year 80% die in hospitals and long term care institutions and perhaps 70% of those after a decision to forego life-sustaining treatment has been made." (Brennan, J., dissenting.)
It is obvious that there is a generalized society sanctioned practice that most of these life-sustaining medical treatment decisions are made without a guardian or any court intervention. Guidelines, p. 18 n. 41. Because we are not confronted with the question of the authority of the family under the facts of this case, we do not in any way evaluate that familial authority.
[17] The dissent urges that the incompetent patient must be protected against the potential pain and discomfort involved in the withdrawal of artificial nutrition and hydration. Dissenting Op. at 96-99. However, this concern is inapplicable to this case because individuals in a persistent vegetative state cannot experience pain or discomfort. The American Academy of Neurology states:

Persistent vegetative state patients do not have the capacity to experience pain or suffering. Pain and suffering are attributes of consciousness requiring cerebral cortical functioning, and patients who are permanently and completely unconscious cannot experience these symptoms.
There are several independent bases for the neurological conclusion that persistent vegetative state patients do not experience pain or suffering.
First, direct clinical experience with these patients demonstrates that there is no behavioral indication of any awareness of pain or suffering.
Second, in all persistent vegetative state patients studied to date, postmortem examination reveals overwhelming bilateral damage to the cerebral hemispheres to a degree incompatible with consciousness or the capacity to experience pain or suffering.
Third, recent data utilizing position emission tomography indicates that the metabolic rate for glucose in the cerebral cortex is greatly reduced in persistent vegetative state patients, to a degree incompatible with consciousness.
Position of the American Academy of Neurology on Certain Aspects of the Care and Management of the Persistent Vegetative State Patient, 39 Neurology 125 (1989). See also President's Commission, Deciding to Forego Life-Sustaining Treatment, 181-82 ("Pain and suffering are absent, as are joy, satisfaction, and pleasure."). It is unclear what additional "studies" or "data" the dissent would require to reenforce this conclusion.
[18] Gramelspacher, Institutional Ethics Committees and Case Consultation: Is There a Role? 7 Issues in Law & Medicine 73 (1991).
[19] Robertson, Ethics Committees in Hospitals: Alternative Structures and Responsibilities, 7 Issues in Law & Medicine 83 (1991).
[20] Parties in interest are listed in the Guidelines for State Court Decision Making in Authorizing or Withholding Life-Sustaining Medical Treatment, at p. 37, as follows:

Parties and Notice
Those having a direct interest in an LSMT case and entitled to notice regarding the proceedings are:
(A) the patient;
(B) the patient's attending physician(s);
(C) the health care facility or agency under whose auspices the LSMT is maintained, or is proposed to be withheld or provided; and
(D) in the case of an incompetent person, the patient's:
(1) guardian, if any;
(2) guardian ad litem, if any;
(3) attorney in fact under a health care power of attorney, if any; or
(4) spouse, next of kin, or close friend or associate over a significant period of time who seeks to speak on the patient's behalf and is known [or is reasonably ascertainable] to the [guardian].
See also sec. 880.01(6), Stats., defining an "interested person" as "any adult relative or friend of a person to be protected under this subchapter; or any official or representative of a public or private agency, corporation or association concerned with his welfare." Where a guardian decides that it is in the best interests of an incompetent ward to have life-sustaining medical treatment withheld or, withdrawn, the guardian must, where feasible, give notice of the decision to all interested parties. This notice need not be formal notice such as that required by sec. 880.08(1), Stats., but must inform the interested parties of the decision and allow an adequate time for such parties to respond.
[1] See State ex rel. Steiger v. Eich, 86 Wis. 2d 390, 391-92, 272 N.W.2d 380 (1978) (stating that the court has the authority to decide an issue when a matter has become moot as to the parties before it). This court granted the motion for continued prosecution by the guardian ad litem despite the death of L.W. I was a dissenting vote to that motion as shown by Wisconsin Supreme Court Order dated April 19, 1991.
[2] In In Matter of Guardianship of Eberhardy, 102 Wis. 2d 539, 307 N.W.2d 328 (1981), we declined to exercise the court's authority to make a determination of whether it was in Joan Eberhardy's best interest to be sterilized rejecting the best interest analysis. The court looked for an "authoritative declaration of public policy to guide the exercise of that irreversible discretionary act." Id. at 568. But here, the court applies its own analysis for terminating life. Under the court's strained decision, life or death will depend on the subjective attitude of guardians. The court labels it a decision in good faith. However, the constitutional right of the incompetent individual to refuse unwanted medical treatment belongs to the individual and not the subjectivity of a guardian. This is the way it should remain until the legislature determines the appropriate criteria for giving a guardian the right to end the ward's life.
[3] See Fidelity Savings Bank v. Aulik, 252 Wis. 602, 32 N.W.2d 613 (1948) (stating that questions of public policy are primarily for the legislature); see also Eberhardy, 102 Wis. 2d at 570 (stating that a court is not an appropriate forum for making policy in certain sensitive areas).

Other state legislatures have enacted laws dealing with lifesustaining treatment. Those states include Illinois (Ill. Laws of the 87th General Assembly 1991 Session, Public Act 87-749, House Bill No. 2334); Iowa (Iowa Code chapter 144A (1991)); Maine (Me. Rev. Stat. Ann. tit. 18-A, sec. 5-707 (1991)); and Louisiana (La. Rev. Stat. Ann. sec. 40:1299.58.1 (1992)). These laws address the problem of withdrawing food and water in great detail and offer burdens of proof, objective standards for making such decisions and indicate exactly who should make decisions on behalf of the patient.
[4] Willed death is not a personal liberty protected by the United States Constitution or the Wisconsin Constitution. The state has an interest in protecting life. Only by statute establishing living wills or power of attorney for health care has Wisconsin recognized the statutory right of individuals to not receive nonorally ingested nutrition and hydration.

The legislature's failure to act in a specific circumstance of human activity does not mean that it must be determined as a matter of law in this court. The legislature has acted in related areas, so it can be expected it will legislate in the area of termination of life for incompetents.
[5] The majority extends the right to refuse all unwanted lifesustaining medical treatment to competent as well as incompetent individuals. There is a difference, however, between decision making of competent and the incompetent. The former can change their minds as to the treatment or lack of treatment while this choice is not available to the incompetent.
[6] Life-sustaining procedures are asked to be withheld only with the following:

a. The continuation of nutritional support and fluid maintenance; and
b. The alleviation of pain by administering medication or other medical procedure.
Section 154.03(2)(b)1, Stats. 1989; see also ch. 154 as amended December 5, 1991.
[7] The trial court adopted the best interest test and set forth 12 criteria to guide the guardian's best interest determination. The majority does not adopt the criteria with good reason; however, the court does not replace them with a test other than good faith. When the state's interest is to preserve life, the burden to end it should be at least clear and convincing. Without such a standard, a circuit court will be hard pressed to review the guardian's order.
[8] It has been stated that " [b]ecause pain is a private, personal experience, it is impossible . . . to know precisely what someone else's pain feels like." McQuillen, Can People Who Are Unconscious or in the "Vegetative State" Perceive Pain? 7 Issues in Law & Med., at 373, 380 (1991) (quoting Melzack, Neuropsychological Basis of Pain Measurement, 6 Advances Pain Res. & Therapy (1984) at 323, 335 (1984)). Nevertheless, studies have been conducted in an attempt to recognize and measure pain. See McQuillen, supra, 380-81. These studies "lend greater credence to a belief in autoregulation of pain at levels below the cortex." Id. at 381.
[9] Cruzan v. Director, Missouri Dept. of Health,  U.S.  110 S. Ct. 2841 (1990), a case cited by the majority, dealt with the rights of competent person's protection of the Fourteenth Amendment liberty interest in refusing unwanted medical treatment. Cruzan lends no insight to the test or rule for incompetent persons.
[10] The majority recites in footnote 20 definitions of parties in interest from Guidelines for State Court Decision Making in Authorizing or Withholding Life-Sustaining Medical Treatment at 37. The majority also cites sec. 880.01(6), Stats., defining an interested person. However, the majority does not say that those are the proper parties in interest to be notified for a hearing determining the right to discontinue life-sustaining medical treatment. This is another reason I would have the legislature determine the total list of parties in interest to be notified for this hearing and whether the persons listed in the guidelines and statute are the limit of "parties in interest."
[11] Interestingly, neither the American Academy of Neurology nor the American Medical Association has suggested laboratory tests that can reliably confirm that a patient's vegetative state is irreversible. See De Giorgio & Lew, Consciousness, Coma, and the Vegetative State: Physical Basis and Definitional Character, 6 Issues in Law & Med. at 361, 370 (1991). Drs. Christopher M. De Giorgio and Mark F. Lew state: There is no reliable EEG pattern specific for the vegetative state. Another test, called the somatosensory evoked response (SER), is predictive of poor outcome if there is bilateral absence of the cortical potential; however, there is a possibility of false positive error. There is no universal CT or MRI abnormality absolutely diagnostic of the vegetative state. Frequently the cerebral cortex is anatomically preserved. PET scanning is a helpful research tool, available in a few centers, but is technically difficult and extremely costly. Furthermore, the published PET results are based on only a few patients. When one examines the Levy PET study, which provided at least a partial basis for the AAN's position, it is clear that at least two or the patients described (No. 4 and No. 10) had significant cognitive recovery after having been in a vegetative state for two to six months.

These two patients point to the problems even experienced and well-respected experts in coma have in reliably diagnosing the persistent vegetative state. It is likely that, just as in the Levy 1987 PET study, severely disabled but awake patients will be lumped with patients who are vegetative. Also, the AAN, in its position paper, does not address the cases in the medical literature where patients in persistent vegetative states have actually regained cognition and, in a few cases, have had good recovery.