NOTICE:  This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports.  Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press.  Errors may be reported by e-mail at the following address: reporter@courts.state.nh.us.  Opinions are available on the Internet by 9:00 a.m. on the morning of their release.  The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

6th Circuit Court-Concord Probate Division
No. 2020-0368

IN RE GUARDIANSHIP OF D.E.

Submitted: August 31, 2020
Opinion Issued: September 18, 2020

Elliott, Jasper, Auten, Shklar & Ranson, LLP, of Newport (Alice C. Ranson and Michael C. Shklar on the brief), for the ward.


Susan L. Regan, guardian, filed no brief.


HICKS, J.  This case is before us on an interlocutory transfer without ruling from the Circuit Court (Moran, J.) pursuant to Supreme Court Rule 9. We accept the facts as presented in the interlocutory transfer statement.  See In re C.M., 163 N.H. 768, 770 (2012).  We recite additional facts, for background only, as set forth in documents submitted in the appendix to the interlocutory transfer statement.

I.  Facts

In February 2020, the 79-year-old ward was a patient at a hospital in Lebanon.  At that time, the hospital filed a petition to appoint a guardian over the ward's person and estate.  The hospital alleged that a guardianship was necessary because the ward "has persistent cognitive impairment due to an anoxic brain injury and a major [neurocognitive] disorder," which "renders him unable to provide for his personal needs for health care, food, clothing, shelter and safety" or to "manage his finances or estate."

The court held a hearing in March at which only the ward's adult children were present. The ward's children testified that, in October 2019, when their father was in the intensive care unit, they executed a "Do Not Resuscitate" (DNR) order for him. The ward had no DNR order previously. When the ward's condition improved and he was transferred to a medical ward, he specifically told his children that he wanted the DNR order removed.

Based upon the evidence at the March hearing, the court found that the ward is incapacitated and that a guardianship is necessary as a means of providing for his "continuing care, supervision, and rehabilitation and for the prudent management of [his] property and financial affairs." The court further found the ward incapable of exercising several rights, including the rights to: (1) "[r]efuse or consent to medical or other professional care, counseling, treatment or service"; (2) "be admitted or discharged from any hospital or other medical institution"; (3) make a will; and (4) "grant power of attorney or other authorizations."

As a result, the court appointed a guardian, granting her the right to exercise certain rights on the ward's behalf, including the right to "determine if refusal should be made or consent should be given to any medical or other professional care, counseling, treatment or service provided." The court specifically directed the guardian to "share medical information with the ward's two children and consult with them on major medical decisions," although the court stated that "[t]he ultimate decision making authority rests with the guardian." (Bolding omitted.)

However, the court preliminarily limited the guardian's authority to execute either a DNR order or an order limiting life-sustaining treatment. The order appointing the guardian stated, in pertinent part:

> Pursuant to RSA 464-A:25, II the Court finds that it is desirable for the best interest of the ward to limit the medical decision making authority of the Guardian and the Guardian's power to execute a Do Not Resuscitate (DNR) order or to execute an order limiting life-sustaining treatment. The best interest of the ward require[s] the Guardian pending further hearing to comply with and honor the specific verbal instructions given by the ward with regard to having a DNR order in place and asking for life-sustaining measures to be utilized. . . . The Court therefore finds that it is desirable for the best interest of the ward to limit the Guardian's authority with regard to executing a DNR order or executing an order limiting life-sustaining treatment without further hearing. The Guardian or any party may request a further hearing on this issue.

(Emphasis added.) See RSA 464-A:25, II (2018).

2

In August 2020, the guardian filed a motion for expedited hearing, asking the court to remove the limitations on her authority regarding the ward's medical care. The guardian averred that the ward, who now resided in a nursing home, was in need of dialysis but had refused dialysis on July 30, August 4, and August 6, and had "not resumed his sessions." The guardian stated that it was "likely that the lack of dialysis [will] cause a systemic infection which [the ward] will not recover from." The guardian asserted that, by declining to resume dialysis, "the ward himself has decided to stop his own life sustaining treatment," and that "without having a DNR order in place and without anyone else having the ability to sign [one]," it will be "quite problematic and painful for the ward." Appended to the motion was a letter from a nurse practitioner stating:

> Without dialysis[,] [the ward's] prognosis is likely measured in weeks to a month. He is at high risk for developing complications including cardiac arrest. I would strongly recommend changing his resuscitation status to "Do Not Resuscitate." An attempt at resuscitation would undoubtedly result in increased suffering and would not change the outcome.

The expedited hearing was held on August 12 at which the ward was present. The guardian, the medical director of the ward's nursing home, the ward's attorney, and the ward's daughter testified. The guardian stated that she would respect the ward's wishes, but "feared there would be an emergency and he would have to be resuscitated." The medical director testified that, since July, the ward has refused to obtain dialysis treatment because he says "it isn't doing anything for him." The medical director stated that by refusing dialysis, the ward is refusing life-sustaining treatment, and that he believes that the ward's "expressed wishes are based on a poor and inconsistent understanding arising from a brain injury." The medical director opined that it is in the ward's best interests for the guardian to make those decisions for the ward and for a DNR order to be in place. The medical director testified that the ward's "quality of life would be diminished if a DNR Order [were] not in place," and that the ward "would be profoundly diminished if resuscitation [were] required." The medical director opined that if the ward "wanted dialysis," then the provider "would be ok with not having a DNR Order in place."

The ward's attorney informed the court that the ward was "very clear that he did not want a DNR Order." She explained that the ward had been resuscitated before and that he "wanted it done again." In response to a question from the court, the ward stated, "Yeah. I want to be resuscitated." He also stated that he would want artificial hydration and nutrition.

The ward's daughter testified that she wanted to honor her father's wishes. She testified that in 2019, her father was resuscitated after having gone into cardiac arrest. She further testified that, in the fall of 2019, after his

3

children had executed a DNR order for him, the ward, his children, and his doctor discussed the DNR. The ward's daughter believes that the ward understood what was said to him. After the doctor explained what a DNR order meant, the ward stated that he did not want one. The ward's daughter further testified that she wanted life-sustaining treatment for her father.

Without ruling, the court transferred the following questions:

1. [W]here a court, under RSA 464-A:25, II, has specifically withheld authority under RSA 464-A:25, I(d) to withhold life sustaining treatment, what standard should be used to determine whether to authorize execution of a DNR by the guardian on behalf of the ward?

2. [U]pon remand, does the Probate Division or the guardian apply the appropriate standard? To put it another way, does the Court simply authorize the guardian to make the decision pursuant to a best interests/substituted judgment/other standard, or does the court apply the standard and direct the guardian whether she may or may not execute a DNR?

Based upon the procedural posture of the case, we reframe the questions as follows:

1. When, pursuant to RSA 464-A:25, II, a court has preliminarily limited a guardian's authority to withhold life-sustaining treatment pending further hearing, and then has conducted that further hearing, what standard should the court use to determine whether to reverse its initial decision?

2. Assuming that the court reverses its initial decision, what standard should the guardian use to determine whether to withhold life-sustaining treatment from the ward, including executing a DNR order on his behalf?

3. Assuming the guardian decides to withhold life-sustaining treatment from the ward, including executing a DNR order on his behalf, and there is a dispute regarding that decision, under what standard should the trial court review the guardian's decision?

4. Assuming that the court upholds its initial decision to limit the guardian's authority, who then has the authority to decide whether to withhold life-sustaining treatment from the ward, including executing a DNR order on his behalf?

4

As reframed, we answer the transferred questions as follows:

1.  By statute, the court may not limit the guardian's authority to withhold life-sustaining treatment unless the court "deems such action desirable for the best interests of the ward."  RSA 464-A:25, II.

2.  Should the court decide to remove the limitation on the guardian's authority to withhold life-sustaining treatment from the ward, including executing a DNR order on his behalf, the standard governing the guardian's decision is the "best interests" standard.

3.  The court reviews a guardian's decision to withhold life-sustaining treatment from a ward, including executing a DNR order on his behalf, under a deferential standard.

4.  Should the court retain the current limitation on the guardian's authority to withhold life-sustaining treatment from the ward, including executing a DNR order on his behalf, then the pertinent provisions of RSA chapter 137-J apply.

## II.  Analysis

Answering the transferred questions requires us to engage in statutory interpretation.  In matters of statutory interpretation, we are the final arbiter of the intent of the legislature as expressed by the words of the statute considered as a whole.  In re Guardianship of L.N., 173 N.H. ___, ___ (decided February 19, 2020) (slip op. at 5).  We first look to the statutory language, and, whenever possible, construe that language according to its plain and ordinary meaning.  Id. at ___ (slip op. at 5).  We interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include.  Id. at ___ (slip op. at 5).  When the language of a statute is unambiguous, we do not look beyond it for further indications of legislative intent.  Id. at ___ (slip op. at 5).

### A.  Standard Governing Decision to Limit Guardian's Authority

We begin by reviewing the pertinent statutory scheme and our prior case law interpreting it.  Under RSA 464-A:25, I, "except as modified by order of the court," a guardian of an incapacitated person has the powers and duties specified in, among other provisions, subparagraph d.  RSA 464-A:25, I (Supp. 2019).  RSA 464-A:25, I(d) provides:

> I.  A guardian of an incapacitated person has the following powers and duties, except as modified by order of the court:
>
> . . . .

5

(d) A guardian of the person may give any necessary consent or approval to enable the ward to receive medical or other professional care, counsel, treatment, or service or may withhold consent for a specific treatment, provided, that the court has previously authorized the guardian to have this authority, which authority shall be reviewed by the court as part of its review of the guardian's annual report. No guardian may give consent for psychosurgery, electro-convulsive therapy, sterilization, or experimental treatment of any kind unless the procedure is first approved by order of the probate court.

The phrase "provided, that the court has previously authorized the guardian to have this authority," RSA 464-A:25, I(d), "does not contemplate a separate and explicit authorization for the specific medical treatment or procedure at issue." In re Guardianship of L.N., 173 N.H. at ___ (slip op. at 7). Rather, "it simply means that the court, having found the ward incapacitated due to a functional limitation impairing the ward's ability to secure and maintain health care for himself or herself, grants the guardian the general authority to make health care decisions for the ward." Id. at ___ (slip op. at 7); see RSA 464-A:2, VII, XI, :9 (2018).

In In re Guardianship of L.N., we concluded "that the general power to give or withhold consent to medical treatment under RSA 464-A:25, I(d) includes the power to withdraw life-sustaining treatment, in appropriate circumstances, without prior court approval." In re Guardianship of L.N., 173 N.H. at ___ (slip op. at 14). However, we acknowledged that, pursuant to RSA 464-A:25, II, a court may limit a guardian's general powers "'if it deems such action desirable for the best interests of the ward.'" Id. (slip op. at 7) (quoting RSA 464-A:25, II). Accordingly, unless the court imposes a limitation under RSA 464-A:25, II, a guardian who has been granted authority to make health care decisions for a ward, who is incapacitated to make his or her own such decisions, possesses the general authority described in RSA 464-A:25, I(d). Id. at ___ (slip op. at 7).

In the instant case, the trial court preliminarily limited the guardian's medical decision-making authority, finding that, "[p]ursuant to RSA 464-A:25, II . . . it is desirable for the best interest of the ward to limit the medical decision making authority of the Guardian and the Guardian's power to execute a Do Not Resuscitate (DNR) order or to execute an order limiting life-sustaining treatment" without further court hearing. The court held a further court hearing on August 12, in response to the guardian's motion to remove the temporary limitation on her authority. Having conducted the August 12 hearing, it is now incumbent upon the trial court to decide whether it is "desirable for the best interests of the ward" to continue or remove the temporary limitation on the guardian's authority. RSA 464-A:25, II.

6

## B. Standard Governing Guardian's Decision to Execute a DNR Order

Should the trial court remove the temporary limitation on the guardian's authority, then, pursuant to RSA 464-A:25, I(d), the guardian will possess the authority "to withdraw life-sustaining treatment, in appropriate circumstances, without prior court approval." RSA 464-A:25, I(d); see In re Guardianship of L.N., 173 N.H. at ___ (slip op. at 14). We now consider what might constitute such "appropriate circumstances," or, more accurately, what standard should be applied to determine whether the circumstances at issue make such an action appropriate.

In In re Guardianship of L.N., we observed that "most jurisdictions addressing the issue of end-of-life decision-making for incompetent patients have employed a substituted judgment approach, a best interests approach, or some combination or variation of the two." In re Guardianship of L.N., 173 N.H. at ___ (slip op. at 11); see In re Estate of Longeway, 549 N.E.2d 292, 299 (Ill. 1989); see also Matter of Conroy, 486 A.2d 1209, 1231-32 (N.J. 1985) (adopting, in addition to a substituted judgment approach, "two 'best interests' tests—a limited-objective [and] a pure-objective test"). The first approach "focuses upon the patient's right of self-determination, the other emphasizes the patient's best interests." Matter of Jobes, 529 A.2d 434, 456 (N.J. 1987) (Handler, J., concurring). "Under substituted judgment, a surrogate decisionmaker attempts to establish, with as much accuracy as possible, what decision the patient would make if he were competent to do so." In re Estate of Longeway, 549 N.E.2d at 299. Under the best interests approach, "a surrogate decisionmaker chooses for the incompetent patient which medical procedures would be in the patient's best interests." Id.

In In re Guardianship of L.N., we specifically left "for another day the question whether substituted judgment, best interests, or some other standard applies to a guardian's decision to withhold life-sustaining treatment from a ward." In re Guardianship of L.N., 173 N.H. at ___ (slip op. at 11). The transferred questions require that we answer that question now.

We conclude that the best interests approach is the appropriate standard for a guardian's decision-making under RSA 464-A:25, I(d), and that the substituted judgment approach would not provide an appropriate standard. First, "[t]he subjective and objective standards", i.e., the substituted judgment and best interests approaches respectively, "involve conceptually different bases for allowing the surrogate to make treatment decisions. The subjective standard is based on a patient's right to self-determination, while the objective standard is grounded in the state's parens patriae power." In re Martin, 538 N.W.2d 399, 408 (Mich. 1995); see also Conservatorship of Wendland, 28 P.3d 151, 163 (Cal. 2001) (noting that "the right to an appropriate decision by a court-appointed conservator does not necessarily equate with the conservatee's right to refuse treatment"). The state's parens patriae power is precisely the

source of a court-appointed guardian's authority: "Inquisition into the competency of a person and the appointment of a guardian is a proceeding by the State in its character of <u>parens patriae</u>, based on its interest in the welfare of the alleged incompetent." <u>Hook v. Simes</u>, 98 N.H. 280, 281 (1953); <u>see also</u> <u>Conservatorship of Wendland</u>, 28 P.3d at 161 (noting that "decisions made by conservators typically derive their authority from . . . the <u>parens patriae</u> power of the state to protect incompetent persons"); <u>In re Fiori</u>, 652 A.2d 1350, 1379 (Pa. Super. Ct. 1995) (Popovich, J., concurring and dissenting), <u>aff'd</u>, 673 A.2d 905 (Pa. 1996); <u>Matter of Guardianship of L.W.</u>, 482 N.W.2d 60, 71 (Wis. 1992). Accordingly, the best interests standard conceptually corresponds to the guardianship construct. As the Supreme Court of New Jersey explained:

> An incompetent, like a minor child, is a ward of the state, and the state's <u>parens patriae</u> power supports the authority of its courts to allow decisions to be made for an incompetent that serve the incompetent's best interests, even if the person's wishes cannot be clearly established. This authority permits the state to authorize guardians to withhold or withdraw life-sustaining treatment from an incompetent patient if it is manifest that such action would further the patient's best interests . . . .

<u>Matter of Conroy</u>, 486 A.2d at 1231.

In addition, the best interests approach corresponds to the legal standard governing all actions by a court-appointed guardian. As the Wisconsin Supreme Court observed with respect to that state's guardianship statute, "court appointed guardians fulfill the <u>parens patriae</u> duty of the state to protect the best interests of an incompetent ward." <u>Matter of Guardianship of L.W.</u>, 482 N.W.2d at 71; <u>see</u> <u>Hook</u>, 98 N.H. at 281. The court noted that the Wisconsin guardianship statute "is replete with admonitions that the guardian's decisions be in the 'best interest' of the ward," and concluded that "[c]onsequently, where it is in the best interests of the ward to withhold or withdraw treatment, the guardian has not only the authority to but a duty to consent to the withholding or withdrawal of treatment." <u>Matter of Guardianship of L.W.</u>, 482 N.W.2d at 71 & n.13.

New Hampshire's statutory provisions governing guardianships of the person explicitly impose a best interests standard on numerous <u>court</u> decisions affecting the ward. <u>See, e.g.</u>, RSA 464-A:25, I(a)(1), (3), (5), (7), (f), II, :39, I(c), III (2018); <u>cf.</u> RSA 464-A:25, I(a)(2), (3) (providing that "[a] guardian may admit a ward to a state institution or other designated receiving facility without prior approval of the probate court upon written certification by [specified professionals] that the placement is in the ward's best interest and is the least restrictive placement available," subject to subsequent notice to and review by the court). While the only explicit statutory standard provided for a <u>guardian's</u>

conduct is that "[a] guardian shall act with respect to the ward in a manner which safeguards to the greatest extent possible the civil rights of the ward, and shall restrict the personal freedom of the ward only to the extent necessary," RSA 464-A:25, I(h), our cases have recognized additional standards. We have recognized that "a guardian stands in a fiduciary relationship to his ward," In re Guardianship of Richard A., 124 N.H. 474, 478 (1984); see also Wentworth v. Waldron, 86 N.H. 559, 561 (1934), and we have held that in permitting the sterilization of a ward under RSA 464-A:25, I(d), "[t]he court must be satisfied that . . . the [guardians for the ward] have demonstrated their good faith and that their concern is for the best interest of the ward." In re Penny N., 120 N.H. 269, 271 (1980). We are satisfied that our law has long required guardians to act in good faith in the best interests of their wards.

By contrast, we have required the guardian to "try to place himself as nearly as possible in the position of the [ward] and take such action as she would probably take if [competent]," only where the statute's plain language "specifically directed [the guardian] to exercise the same rights which the [ward] would have, if [competent]." Wentworth, 86 N.H. at 564 (interpreting statute relating to guardian's right to waive provisions of will in favor of ward); see RSA 464-A:34 (2018). RSA 464-A:25, I(d), however, does not direct the guardian to exercise "the same rights that the ward would have, if legally competent," to make his or her own health care decisions. RSA 464-A:34. Rather, it authorizes the guardian to give or withhold consent for the ward to receive medical and other services. See RSA 464-A:25, I(d). We conclude that RSA 464-A:25, I(d) empowers a guardian to exercise his or her judgment, in good faith and in the ward's best interests, to give or withhold such consent. See In re Penny N., 120 N.H. at 271.

This distinction differentiates RSA 464-A:25, I(d) from statutes in other jurisdictions that have been interpreted to require a guardian to exercise the ward's right to self-determination. See Matter of Guardianship of Hamlin, 689 P.2d 1372, 1378 (Wash. 1984) (noting that the statutory "duties of the guardian are to assert the 'rights and best interests' of the incompetent person," which "includes the power to assert the incompetent's personal right to refuse life sustaining treatment"). Because RSA 464-A:25, I(d) does not empower the guardian to assert the ward's own right to refuse treatment, we conclude that it is not governed by the substituted judgment standard, which is based — whether actually or fictionally — upon that right.

For the foregoing reasons, we conclude that RSA 464-A:25, I(d) contemplates the guardian's use of the best interests standard in making health care decisions for the ward, including decisions to withhold life-sustaining treatment from a ward.

9

C.  Standard Governing Court Review of Guardian's Decision

We next consider the standard by which the trial court should review a guardian's decision to withhold life-sustaining treatment from a ward.  In In re Guardianship of L.N., we did not need to decide "which standard might apply in a case where the guardian's decision is challenged and court involvement . . . is warranted," because in that case, there was no such challenge.  In re Guardianship of L.N., 173 N.H. at ___ (slip op. at 11).  In the instant matter, by contrast, the trial court has specifically found that there is a disagreement between the ward and family members, on the one hand, and the medical director of the ward's nursing home and the guardian, on the other hand, as to "what is in the ward's best interests."  Accordingly, we now consider the standard by which the trial court should review the guardian's decision in this case, assuming that the guardian decides to execute a DNR order for the ward.

In In re Guardianship of L.N., we noted that a guardian "stands in a fiduciary relationship to his ward," and that "the established standards governing fiduciaries apply to guardians."  Id. at ___ (slip op. at 11) (quotation omitted).  We explained that, as a fiduciary, a guardian has the duty "to act primarily for the ward's benefit and in good faith."  Id. at ___ (slip op. 11) (quotation, brackets, and citation omitted).  In this context, "good faith" means that the guardian's decision is not "affected by a material conflict of interest" and that the guardian has "consider[ed] the available information relevant to the ward's best interests."  Id. at ___ (slip op. at 11) (quotations and brackets omitted).

Consistent with those observations, we now hold that the trial court's review of a guardian's decision to withhold life-sustaining treatment, including the decision to execute a DNR order, is deferential.  See Wentworth, 86 N.H. at 562 (explaining the conduct of any fiduciary must be judged in light of the principle that "[w]here discretion is conferred upon [the fiduciary] with respect of the exercise of a power, its exercise is not subject to control by the court, except to prevent an abuse by the [fiduciary] of his discretion" (quotation omitted)).  The trial court must uphold the guardian's decision unless the court finds that the guardian did not "act primarily for the ward's benefit" and/or "in good faith."  In re Guardianship of L.N., 173 N.H. at ___ (slip op. at 11) (quotation and brackets omitted).

D.  Decision to Withhold Life-Sustaining Treatment if Guardian Lacks Authority

Should the trial court decline to remove the current limitation on the guardian's authority to withhold life-sustaining treatment from the ward, then the relevant provisions in RSA chapter 137-J apply.  As relevant to this matter, with regard to DNR orders, RSA 137-J:25, I, specifically provides that "[e]very person shall be presumed to consent to the administration of cardiopulmonary

resuscitation" unless the person has a DNR order executed in accordance with RSA chapter 137-J, an advance directive, or the person "lacks capacity to make health care decisions," is "near death," has been "admitted to a health care facility," and either the person's agent under his or her advance directive is unavailable or is not "legally capable of making health care decisions for the person." RSA 137-J:25, I (2015) (amended 2020). In the latter case, "the attending physician or APRN and a physician knowledgeable about the patient's condition" may complete a DNR order on the patient's behalf if they determine that resuscitating the patient "would be contrary to accepted medical standards and would cause unnecessary harm to the person." RSA 137-J:25, I(c).

In the instant matter, although the trial court has determined that the ward lacks capacity to make health care decisions, the trial court has not found that he is "near death" or that he has been "admitted to a health care facility." Id. Accordingly, it does not appear that at this time, a DNR order may be executed on his behalf by his health care providers.

As to the authority to withhold life-sustaining treatment, RSA 137-J:1, III (2015) provides:

> While all persons have a right to make a written directive, not all persons take advantage of that right, and it is the purpose of the surrogacy provisions of this chapter to ensure that health care decisions can be made in a timely manner by a person's next of kin or loved one without involving court action. This chapter specifies a process to establish a surrogate decision-maker when there is no valid advance directive or a guardian, as defined in RSA 464-A, to make health care decisions.

Under that process, in brief, a "physician or APRN shall make a reasonable inquiry . . . as to whether the patient has a valid advance directive and, to the extent that the patient has designated an agent, whether such agent is available, willing and able to act." RSA 137-J:35, I (2015) (amended 2020). If no health care agent is authorized and available, then inquiry shall be made as to the availability of surrogates to make the decision without court order or judicial involvement. Id. Such surrogates include a person's adult child. RSA 137-J:35, I(b). The surrogacy process described in RSA 137-J:35 applies only when a person "lacks capacity to make health care decisions," and has no "valid and unrevoked living will, or an authorized agent under a durable power of attorney." RSA 137-J:34 (2015), :35, I.

In this case, the trial court has already determined that the ward lacks the capacity to "[r]efuse or consent to medical or other professional care, counseling, treatment or service." The record does not indicate whether the ward has "a valid and unrevoked living will" or "an authorized agent under a

11

durable power of attorney for health care," however, the transferred questions suggest that he does not. Additionally, the ward's attorney represents that the ward lacks a "properly executed . . . Advance Directive in conformity with RSA [chapter] 137-J."

Although the ward has a guardian to make health care decisions on his behalf, the trial court has limited the guardian's authority to withhold life-sustaining treatment from the ward, including whether to execute a DNR order on his behalf. Under these circumstances, given the ward's lack of capacity to make health care decisions generally, and assuming that he does not have a valid and unrevoked living will or an authorized agent under a durable power of attorney for health care, the process for appointing a surrogate, as described in RSA 137-J:34-:37, applies.

Counsel for the ward argues that the trial court implicitly determined that the ward retained the capacity to decide whether to withhold life-sustaining treatment, including executing a DNR. We do not share counsel's interpretation of the trial court's order appointing a guardian for the ward. The interpretation of a trial court order is a question of law, which we review de novo. In the Matter of Salesky & Salesky, 157 N.H. 698, 702 (2008). In that order, the trial court specifically found that the ward is incapacitated due to a functional limitation impairing his ability to secure and maintain health care for himself. See In re Guardianship of L.N., 173 N.H. at ___ (slip op. at 7); see RSA 464-A:2, VII, XI. In addition, although the trial court limited the guardian's authority to withhold life-sustaining treatment from the ward, including the authority to execute a DNR order on his behalf, the court did not do so because it deemed the ward capable at that time of making such decisions.

Counsel for the ward also asserts that, even though the ward has not executed an advanced directive, his statements regarding his wish not to have a DNR are binding pursuant to RSA 137-J:6 (2015) (amended 2020). RSA 137-J:6 provides:

> After consultation with the attending physician or APRN and other health care providers, the agent or surrogate shall make health care decisions in accordance with the agent's or surrogate's knowledge of the principal's wishes and religious or moral beliefs, as stated orally or otherwise communicated by the principal, or, if the principal's wishes are unknown, in accordance with the agent's or surrogate's assessment of the principal's best interests and in accordance with accepted medical practice.

Counsel for the ward contends that, under this statute, the ward is the "principal" and his "wishes . . . as stated orally or otherwise communicated" must be honored by the guardian. RSA 137-J:6. The statute specifically

applies to "agents" and "surrogates" as defined by RSA 137-J:2, III (2015) and :2, XXII-a (2015) (amended 2020).  Because the ward has not executed an advance directive, he does not have an "agent," and, at this time, no "surrogate" has been appointed for him pursuant to RSA 137-J:35 (2015) (amended 2020).

So ordered.

BASSETT and DONOVAN, JJ., concurred.